**SO ORDERED.**

**SIGNED this 4th day of October, 2022.**



*Dale L. Somers*
Dale L. Somers
United States Chief Bankruptcy Judge

___

Designated for online use but not print publication
**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **In re:** | |
| **Calvin Gene Lay** | **Case No. 22-40084** |
| **Toni Lyvette Lay,** | **Chapter 13** |
| **Debtors.** | |

**Memorandum Opinion and Order
Determining Value of Debtors' Manufactured Home**

The issue before the Court is the retail value of Chapter 13 Debtors Calvin Gene Lay and Toni Lyvette Lay's manufactured home (the "Home"). The Home is not on a foundation, and the certificate of title has not been surrendered, so it remains personal property. Creditor 21st Mortgage Corporation ("21MTG") holds a claim for $58,486.34 secured by a perfected lien on the Home. In a Chapter 13 plan, 21MTG is entitled to payment of a

secured claim in the amount of the value of the Home and an unsecured claim to the extent its claim exceeds the value of the Home. Debtors' proposed Chapter plan 13 values the Home at $31,991.70. 21MTG objects, asserting that the value of the Home is $72,147.98. Trial was held on the value of the Home.[1] Having carefully considered the applicable law, the evidence, and the reports of the parties' expert witnesses, the Court concludes that for the purpose of Debtors' Chapter 13 plan, the value of the Home is $51,000.

## I. Findings of Fact

### A. The manufactured Home

The facts about the Debtors' manufactured Home are undisputed. It is an 2007 Oak Creek, 28 by 60 foot, double wide, with four bedrooms and two baths. Debtors purchased the Home new in June 2008. It is located in rural Liberal, Kansas on a lot leased by Debtors, who have resided in the Home since its purchase. The wheels and axles have been removed, but the Home is not on a foundation. The Home is in good condition with minimal deferred maintenance.

---

[1] Debtors appeared in person and by their counsel, Adam M. Mack. 21MTG appeared by Sharon L. Stolte. The parties stipulated to the jurisdiction of the Court and consented to the trial and the entry of final order by the Bankruptcy Court. Doc. 38.

Debtors purchased the Home new from Oak Creek Homes. The seller financed approximately $79,000 of the $83,312 purchase price and was granted a purchase money security interest in the Home. Oak Creek Homes assigned the note and security interest to 21MTG, whose lien is noted on the Home's Kansas certificate of title. The parties agree that 21MTG's claim is secured by a perfected lien on the Home, which is personal property for purposes of this case.

**B. Relevant bankruptcy proceedings**

Debtors filed for relief under Chapter 13 on March 8, 2022. In the schedules, the Home is claimed as Debtors' exempt homestead with a value of $31,991.70. 21MTG is listed as a creditor with a claim of $60,893, secured by the Home. Debtors' proposed Chapter 13 plan[2] treats 21MTG's claim as a general personal property secured claim entitled to payment in the amount of the value of the Home ($31,991.70) and an unsecured claim to the extent 21MTG's allowed claim exceeds the value of the Home.

21MTG objected to the proposed plan.[3] In the objection, 21MTG states it is the holder of a claim in the amount of $58,486.34 as of the petition date, secured by the Home. The objection includes the assertion that the proposed

---

[2] Doc. 3.

[3] Doc. 28.

3

plan undervalues the Home, that "[u]pon information and belief," the value of the Home is $59,079.23, and the plan must provide 21MTG the full value of its collateral. Trial limited to the value of the Home was held.

**C. Valuation evidence**

Debtor Calvin Lay testified as to the basis for the $31,991.70 valuation stated in his schedules and his proposed Chapter 13 plan. Debtor is not an appraiser and no attempt was made to qualify him as an expert. Using an online form on the J.D. Power website, he generated a J.D. Power Used Manufactured Home Value Report[4] for a 2008, 28 by 60 foot home, manufactured by Oak Creek Homes Inc, trade name, Galaxy 560, located in Kansas.[5] With adjustment for the good condition of the Home and accessories, the reported retail value was $41,991.70. From this value, Debtor subtracted $10,000 as the estimated cost to relocate the Home, resulting in a value of $31,991.70.

Debtor presented the expert testimony of Evan Winchester, of Winchester Enterprises, Liberal, Kansas. Mr. Winchester is licensed as a general real property appraiser in the State of Kansas, with thirty years experience valuing both real and personal property, including manufactured

---

[4] In 2022, NADAguides.com was re-branded as JDPower.com.

[5] Exh. 4.

4

homes. He inspected the interior and exterior of the Home. He noted that the kitchen and master bedroom and bath had been updated within the past five years and were in good condition, that the remainder of the interior was in average condition, and the exterior had some deferred maintenance. He concluded that overall the Home is in average condition for a manufactured home of like age in the market area. As to the appraisal method, he relied on the comparable sales approach.[6] Data for the comparable sales was derived from sales of manufactured homes in the Liberal area reported by the real estate multiple listing service and in the county appraisal records. After reviewing multiple sales in the area, he selected six recent sales of comparable manufactured homes. All were manufactured homes of the same construction quality as Debtors' Home. Appropriate adjustments were made for such matters as gross living area, age, and condition. A $10,000 deduction was made from each comparable property to account for moving costs. Based upon a weighted average of the comparables, under which those sales needing

---

[6] Mr. Winchester's appraisal included a value based upon the cost approach. As to this approach, he used data from CoreLogic, rather than J.D. Power data relied upon by the Debtor. Using CoreLogic data, Mr. Winchester determined the value to be $45,177. This determination started with an estimated replacement cost of $79,064 and then applied straight line depreciation, assuming a remaining life of twenty years. In Mr. Winchester's opinion, the cost approach is reliable when applied to new manufactured homes, but should be given little weight as to older homes because of its reliance on depreciation based upon the age of the manufactured home.

the least adjustment were given higher weight, Mr. Winchester concludes the retail value of the Home is $41,000. Mr. Winchester testified that there are no retail merchants of used manufactured homes in the Liberal, Kansas area. The most common sale method in the area for manufactured homes is through the multiple listing service used by real estate agents, who in essence act as retail merchants on behalf of sellers of used manufactured homes.

Creditor 21MTG provided an appraisal report prepared by expert witness Robert Keck of R. Keck Enterprises, LLC of New Tazewell, Tennessee. He is trained to perform manufactured home adjusted cost appraisals using the J.D. Power (NADA) system and has extensive experience using the system. His appraisal, using the depreciated cost method, started with inspection of the Home, inside and outside. From examination of the manufacturer's label affixed to the Home, he determined the year of manufacture, the manufacturer, and trade name, the starting point of a NADA valuation. Based upon this information, and the Home's location, J.D. Power data yielded a base structure value (book value for average condition) of $54,419.52.

In accord with J.D. Power procedures, Mr. Keck adjusted base structure value for state of location, condition, and additional features. J.D. Power uses

data from multi state regions[7] when determining the base structure value; the location adjustment for Kansas increased that value by two percent. The upward eleven percent adjustment for condition is based upon Mr. Keck's conclusion after thorough inspection that the Home is in good condition, defined by J.D. Power to mean "normal wear and tear are visible, but the subject property is well maintained, still attractive, desirable, and useful."[8] Additional features of the Home, such as solid hardwood cabinets, coved counter tops, and tile flooring, increased the value by $12,673.44, which was off set in part by required repairs of $2,139.24. Mr. Keck concluded that the retail market value of the Home is $72,147.98, based upon adjusted J.D. Power data.

Mr. Keck testified about the significant difference between his expert appraisal value ($72,147.98) and Debtor Calvin Lay's valuation ($31,991.70). Both used J.D. Power data and methodology. The primary difference is the base structure value - $54,419.52 used by Mr. Keck and $36,757.44 used by Debtor.[9] Mr. Keck testified that this difference is explained by the fact Debtor

---

[7] Kansas is included in a seven state region comprised of Missouri, Kansas, Iowa, Nebraska, North Dakota, South Dakota, and Minnesota.

[8] Exh. A, p. 4.

[9] An apparently significant difference between Debtor Calvin Lay's and Mr. Keck's valuations include Debtor's use of SVS quality standard, which Mr. Heck testified was not appropriate. Because Mr. Heck is trained in use of the J.D. Power

7

erroneously used Oak Creek Manufactured Homes, Inc. as the manufacturer when J.D. Power provides that for Oak Creek Homes, Inc. branded homes the manufacturer name should be changed to American Homestar Corp.

Mr. Keck does not favor the comparable sales method of appraisal of manufactured homes. He observed that it is incredibly unlikely that there will be recent sales of identical manufactured homes in a specified area. Further, the comparable sales used in such appraisals usually involve only drive-by inspections, from which the specific finishes of similar looking homes cannot be evaluated.

## II. Analysis

The issue before the Court is the value of Debtors' manufactured Home. The parties agree the manufactured Home is personal property, subject to a perfected lien held by 21MTG.[10] Debtors' proposed Chapter 13 plan provides that the home will be retained and periodic payments will be made to 21MTG equal to the value of the home. The Home's value must be established to

---

system and Debtor is not, the Court finds Mr. Keck more credible than Debtor in this regard.

[10] Under Kansas law, a titled manufactured home is personal property unless the home is permanently affixed to real property and the owner applies to have the certificate of title eliminated thereby converting the home to real property. K.S.A. 58-4202(a). A security interest in a manufactured home which remains personal property is perfected by notation on the certificate of title. 21MTG's lien is noted on the certificate of title for Debtors' home. Exh. D.

determine the payments on 21MTG's claim and if the proposed Chapter 13 plan is feasible.

Under § 1325(a)(5),[11] a debtor seeking confirmation of a Chapter 13 plan has three options with respect to secured claims provided for by the plan: (1) to obtain the creditor's acceptance of the plan; (2) to retain the collateral and make payments equal to the present value of the secured claim; and (3) surrender the collateral to the secured creditor. Under § 506(a)(1), an allowed claim of a secured creditor is bifurcated into a secured claim in the amount of the value of the collateral and an unsecured portion reflecting the remaining debt or deficiency. A debtor electing the second plan option, known as "cram down," satisfies the creditor's claim by making monthly payments equal to the present value of the secured portion of the claim and treating the remaining claim as an unsecured claim.

The Supreme Court in *Rash*[12] held that under § 506(a) the value of property to be retained when a debtor has exercised the Chapter 13 cram down option is the cost the debtor would incur to obtain a like asset for the same proposed use. Relying on the statutory directive that the value be

---

[11] 11 U.S.C. § 1325(a)(5). All references in the text to title 11 are to the section number only.

[12] *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953 (1997).

9

determined in light of the proposed disposition and use of the property, *Rash* adopted replacement value and rejected a foreclosure value as the applicable standard.[13] When a debtor intends to retain the collateral, replacement value better reflects the actual use intended by the debtor. However, *Rash* did not define how replacement value is to be determined. It stated,

> Our recognition that the replacement-value standard, not the foreclosure-value standard, governs in cram down cases leaves to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented. Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property.[14]

In 2005, as a part of BAPCPA, Congress provided guidance for some of the issues left open in *Rash* by enacting § 506(a)(2). It applies in this case and provides:

> If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed [secured] claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind

---

[13] *Id.* at 960-61.

[14] *Id.* at 965 n.6.

10

considering the age and condition of the property at the time value is determined.

Congress thereby specified that replacement cost is the retail value, not wholesale value. Importantly for this case, the statute does not identify a required appraisal method, such as whether the comparable sale method should be preferred over the depreciated cost method. Ascertaining replacement value is "a fact-specific issue that is generally resolved through competing expert testimony."[15]

Since in this case the Home was acquired for Debtors' personal use, under § 502(a)(2), replacement value is what a retail merchant would charge for the Home at the time of filing the petition. The evidence is conflicting.

Debtor Kevin Lay testified the value is $40,703.44, as reflected in his schedules. To determine that value, Debtor used the J.D. Power website questionnaire but, as convincingly explained by 21MTG's expert, Debtor used a manufacturer name and model which do not accurately describe the Home. Debtor's testimony fully explains the basis for the value used in his schedules and proposed plan filed with the schedules, but is not credible when offered as evidence of the retail value for purposes of cram down. The Court therefore gives no weight to Debtors' valuation testimony.

---

[15] 2 William L. Norton III, *Norton Bankr. L. & Prac.* 3d § 52:3 (Thompson Reuter).

11

This leaves for consideration the values determined by the two experts. Creditor 21MTG's expert, Mr. Keck, used J.D. Power manufactured home depreciated cost valuation data, adjusted for condition, additional features, and estimated repair costs. In Mr. Keck's opinion the retail value is $72,147.98. The Debtors' expert, Mr. Winchester, used the comparable sales method of appraisal commonly adopted by real property appraisers. Mr. Winchester's opinion is that the retail value is $41,000. Both appraisers inspected the Debtors' Home, prepared thorough reports, and were credible witnesses.[16]

The question is whether under the circumstances of this case, a depreciated cost valuation based upon NADA data and methodology or a value based upon comparable sales is a better estimate of the retail value of the Debtors' Home for purposes of cram down. As stated above, the Code does not specify the method of appraisal. There is no controlling case law.

---

[16] Neither party attempted to discredit the other parties' appraisal based upon details in the competing reports. For example, Debtors did not challenge the specific adjustments to the base structure value for the home's condition and additional features made by Mr. Keck. 21MTG did not challenge any of the specific comparable sales or adjustments to those sales made by Mr. Winchester. 21MTG did challenge Mr. Winchester's consideration of moving costs. This issue is addressed below.

12

Courts frequently use the NADA guide data approach when valuing manufactured homes.[17] Superficially, the valuation question here is similar to that of a motor vehicle, for which courts routinely use a NADA value as a starting point.[18] Debtors' manufactured home, like a motor vehicle, is personal property. A NADA data base for manufactured homes is readily available, as it is for motor vehicles, and adjustments can be made for age, condition, and accessories. But valuing manufactured homes using the NADA method is "not without its difficulties" and some courts prefer comparable sales values.[19]

The facts and circumstances of this case convince the Court that the comparable sale appraisal of Mr. Winchester better estimates the retail value of Debtors' manufactured Home. The overarching basis for this conclusion is the location of the manufactured Home. Its address is rural Liberal, Kansas, a sparsely populated region in the far southwest corner of the state. Mr.

---

[17] *In re Rucker*, No. 17-04552, 2018 WL 3244458 (Bankr. S.D. Miss. July 3, 2018); *In re Coleman*, 373 B.R. 907, 912-913 (Bankr. W.D. Mo. 2007) (NADA retail value is starting point); *In re Kollmorgen*, No. 11-10904, 2012 WL 195200 (Bankr. D. Kan. Jan. 20. 2012).

[18] *E.g., In re Cook*, 415 B.R. 529, 535 (Bankr. D. Kan. 2009) (Nugent, J.).

[19] *In re Gensler*, No. 15-10407, 2015 WL 6443513, at *5 (Bankr. D.N.M. Oct. 23, 2015) (citing *In re Arendarczk*, No. 14-40844, 2014 WL 6629770 (Bankr. S.D. Ga. Nov. 21, 2014)); *In re Meredith*, No. 1-12-bk-06283, 2013 WL 4602966 (Bankr. M.D. Pa. Aug. 29, 2013).

13

Winchester's comparable sales were within 21 miles of the Home. The NADA data used by Mr. Keck was based upon a seven state region (Missouri, Kansas, Iowa, Nebraska, North Dakota, South Dakota, and Minnesota), and then adjusted upward by two percent for the state of Kansas. The resulting appraised value is the retail price that a manufactured home retail dealer located anywhere in the state of Kansas would receive for the Home, without regard to the demographics and economies of the specific sale location. But, as Mr. Winchester testified, there are no manufactured home dealers in the Liberal, Kansas area. More importantly, in the Liberal area, real estate agents using the multi list service act as retail sellers of used manufactured homes.

Mr. Keck testified that in his opinion the comparable sales method of appraisal is inappropriate for used manufactured homes. Manufacturers make several models that look alike from the outside but have different interior finishes which are critical as to value. As in this case, appraisers using the comparable sales method generally do not inspect the inside of the comparable properties. Although this is a reasonable criticism of the comparable sales approach, the Court declines to find it discredits Mr. Winchester's valuation because there is no evidence that inside inspections of

14

the comparable sales used by Mr. Winchester would have changed the valuation in this case.

However, there is one element of Mr. Winchester's valuation analysis which the Court rejects. That is the deduction of $10,000 from the values of comparable sales for moving costs. In *Rash*, the Supreme Court emphasized that "the 'proposed disposition or use' of the collateral is of paramount importance to the valuation question."[20] Therefore when the valuation is of the manufactured home to be used by the debtor in its present location, the value does not include tangential services, such as delivery and set up.[21] Likewise, courts hold that the value of a manufactured home should not be reduced by the cost to move.[22] If moving costs are deducted from the value of comparable sales, the resulting appraised value would include a hypothetical event that will not occur, the moving of the comparable manufactured homes to Debtors' address, yet the retail value of the comparable manufactured homes would be unchanged. This Court agrees with the New Mexico bankruptcy court that "when the proposed disposition is to keep a [manufactured] home at its current location, *Rash's* rationale indicates that

---

[20] *Rash*, 520 U.S. at 962.

[21] *In re Glenn*, 900 F.3d 187, 192 (5th Cir. 2018).

[22] *E.g.*, *In re Gensler*, 2015 WL 6443513, at *3.

15

all moving costs, whether increasing or decreasing value, should be disregarded."[23] The Court therefore concludes that the testimony of Mr. Winchester, Debtors' expert appraiser, supports a value of $51,000, not $41,0000.[24]

### III. Conclusion

For the foregoing reasons, the Court holds that the value of Debtors' manufactured Home for purposes of their Chapter 13 plan is $51,000.

**It is so Ordered.**

### ###

---

[23] *Id.* at *4.

[24] Because the $10,000 estimated moving cost was deducted from the value of each comparable before the weighted average was calculated and the $41,000 appraised value is the weighted average of the comparable sales, the simple deduction of $10,000 from the appraised value does not precisely duplicate the result Mr. Winchester would obtain if he were to recalculate the weighted average of the comparables with the $10,000 moving cost eliminated. The Court has determined the discrepancy between an actual recalculation and the estimated adjusted value of $51,000 is very minor.